**UPPER YAMPA WATER CONSERVANCY DISTRICT, Applicant–Appellant**

v.

**DEQUINE FAMILY L.L.C.; Flying Diamond Resources, Ltd.; Kim Singleton; James A. Larson; Colorado Water Conservation Board; Dick Wolfe, State Engineer; and Erin Light, Division Engineer Water Division 6, Opposers–Appellees.**

No. 09SA118.

Supreme Court of Colorado,
En Banc.

April 11, 2011.

Weiss & Van Scoyk, LLP, Robert G. Weiss, Steamboat Springs, Colorado, Balcomb & Green, PC, David Hallford, Scott A. Grosscup, Glenwood Springs, Colorado, Attorneys for Applicant–Appellant.

Petros & White, LLC, Charles B. White, Denver, Colorado, Attorneys for Opposers–Appellees, Dequine Family, L.L.C.; Flying Diamond Resources, Ltd; Kim Singleton; and James A. Larson.

John W. Suthers, Attorney General, John J. Cyran, First Assistant Attorney General, Scott Steinbrecher, Assistant Attorney General, Denver, Colorado, Attorneys for Opposers–Appellees Dick Wolfe, State Engineer and Erin Light, Division Engineer Water Division 6.

Justice COATS delivered the Opinion of the Court.

The Upper Yampa Water Conservancy District appealed directly to this court from an order of the water court dismissing its application for a conditional water right. After presentation of the District's case, the court granted the opposer Dequine Family's C.R.C.P. 41(b) motion and dismissed for failure of the District to establish a need for water in the claimed amount sufficient to satisfy the requirements of the anti-speculation doctrine.

Because the District's evidence of existing demands included contracts for stored water that had admittedly not yet been put to beneficial use and for which no specific plan for beneficial use was offered, and because the District made no attempt to demonstrate a reasonably anticipated future need based on projected population growth, its proof was insufficient to establish that it had made the required "first step" to obtain a conditional water right. The judgment of the water court is therefore affirmed.

## I.

The Upper Yampa Valley Conservancy District, a political subdivision of the state formed to provide water to its constituents in Routt and Moffat Counties, filed an application for conditional water rights in Water Division No. 6. In its application, the District claimed a conditional water right in the amount of 50 cubic feet per second, to be diverted from Morrison Creek to Little Mor-

rison Creek and into its existing Stagecoach Reservoir, to serve a number of purposes, including municipal, industrial, irrigation, stockwater, hydropower production, recreation, and augmentation and exchange for such uses. Among its enumeration of claimed uses, the District's application included the phrase, "and for storage in Stagecoach Reservoir for such uses, including later releases from storage for such uses."

Several landowners in the Morrison Creek drainage—the Dequine Family L.L.C., Flying Diamond Resources, Ltd., Kim Singleton, and James A. Larson—on whose property the physical diversion and conveyance facilities would be located, filed objections to the application. In response to their motion for determination of a question of law, the water court ruled that direct flow and storage rights are distinctly different, each with its own separate requirements, and that the two cannot be united as a single water right nor can a direct flow conditional water right be decreed for the beneficial use of storage. The District's engineering report was revised to reflect this ruling, and the amount conditionally claimed was reduced from 50 to 40 c.f.s. The matter then proceeded to trial on the District's theory that the water for which it claimed a conditional right could be used on a direct flow basis and still meet the District's identified needs. Prior to trial, the State and Division Engineers were granted permission to intervene.

The District presented its case through two witnesses: its expert and a former officer and current member of its executive committee. Its evidence indicated that the District had a portfolio of existing water rights, substantially exceeding the physical capacity of the 33,275–acre–foot reservoir, including an absolute right from the Yampa River exclusively for hydropower generation at the Stagecoach Dam in the amount of 110 c.f.s.— the maximum capacity of the hydropower plant. Although it had contractual obligations for storage and delivery of 13,192 acre feet to various municipal and commercial users, and required an additional 2,000 acre feet for its "umbrella plan for augmentation," the District presented evidence that the firm yield of Stagecoach Reservoir—the amount of water that can be released without failure even in the driest years—was limited to 8,825 acre feet. The District's expert calculated that the claimed conditional right would increase the reservoir's firm yield by no more than 2,615 acre feet, leaving it well below the District's existing obligations of fifteen thousand-plus acre feet.

In addition, the District's representative conceded that a relatively small percentage of its contractually-obligated water had ever been released, and he testified, on both direct and cross-examination, that 7,000 acre feet of the District's contracted-for water was committed to Tri–State Generation and Transmission Association, Inc., but was not associated with any existing or planned project. The witness testified that this contract was originally negotiated with Tri–State's predecessor, Colorado Ute Electric Association, and involved no immediate demand for the contracted-for water or plan to put it to any beneficial use.

At the close of the District's evidence, the Opposers moved pursuant to C.R.C.P. 41(b) to dismiss, asserting that the District had failed to establish any need for the new appropriation. In arguing the motion, the District made clear its theory that it could put the Morrison Creek water to beneficial use on a direct flow basis by passing it through the hydropower plant at the Stagecoach Dam, thereby freeing 40 c.f.s. of the Yampa River water decreed for hydropower purposes to be used instead to increase the reservoir's firm yield and assist in meeting the District's other obligations. The Opposers and Engineers countered that water appropriated solely for use in generating hydropower could not be applied to different uses altogether without a change of water right. They also asserted that an additional water right for a purpose already satisfied by an existing appropriation would necessarily amount to waste and therefore the application should be denied for failure to demonstrate an intent to put the claimed water to a beneficial use.

The water court granted the Opposers' motion to dismiss, finding that the District failed to prove that it had sufficient need to satisfy the requirements of the anti-specula-

tion doctrine. The court expressly found the District's existing water rights associated with Stagecoach Reservoir to be adequate to meet its reasonably foreseeable demand for water both from the reservoir and for hydropower production at the dam. The District appealed directly to this court from the water court's order dismissing the application, as well as its order disallowing a united appropriation for both direct flow and storage uses.

## II.

■ No decree for a conditional water right may be granted except to the extent that the applicant establishes that the waters for which the conditional right is sought will not only be diverted, stored, or otherwise captured, possessed, and controlled but will also be beneficially used. § 37–92–305(9)(b), C.R.S. (2010). It is now too well-settled to merit elaboration that the intent to appropriate water for a beneficial use, proof of which is an integral part of the applicant's obligation to show it has made a "first step" toward appropriation, cannot be based on the speculative sale or transfer of the appropriative rights. *See City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 32, 36–37 (Colo. 1996) (discussing treatment of the anti-speculation doctrine in *Colorado River Water Conservation Dist. v. Vidler Tunnel Water Co.*, 197 Colo. 413, 594 P.2d 566 (1979)); *see also Pagosa Area Water & Sanitation Dist. v. Trout Unlimited*, 170 P.3d 307, 314 (Colo. 2007) (hereinafter *"Pagosa I "*). And while we may have found the application in *Vidler* to be unduly speculative for lack of "firm contractual commitment[s]," 197 Colo. at 417, 594 P.2d at 568, we never suggested that the existence of firm contractual commitments alone would be sufficient to demonstrate a *non-speculative* sale or transfer.

■ Following our *Vidler* decision, the legislature amended the definition of "appropriation" in the Water Right Determination and Administration Act of 1969 to codify the prohibition of speculation articulated in *Vidler*. *Bijou*, 926 P.2d at 38; Ch. 346, sec. 5, § 37–92–103(3)(a), 1979 Colo. Sess. Laws 1368. Using virtually the same nega-

tive formulation, the statute specifies that no appropriation of water, either absolute or conditional, can be held to occur when the proposed appropriation is based on the speculative sale or transfer of the appropriative rights to persons who are not parties, and further, that a failure of the purported appropriator to have a specific plan and intent to divert (or store) and control "a specific quantity of water for specific beneficial uses" will render such a sale or transfer "speculative." § 37–92–103(3)(a), (3)(a)(II). Therefore, both the applicable statute and prior case law make clear that a conditional appropriation cannot be based on a sale or transfer of appropriative rights, notwithstanding the existence of firm contractual commitments, in the absence of a specific plan and intent for application of the appropriative waters to a beneficial use. *See Bd. of Cnty. Comm'rs v. United States (In re the Application for Water Rights of the Bd. of Cnty. Comm'rs)*, 891 P.2d 952, 959 (Colo. 1995) ("To prevent speculation, *Vidler* requires a firm contract or agency relationship with a proposed user who is committed to beneficially use the water.").

■ Even after our construction of the statute as perpetuating the planning flexibility previously allowed government agencies with respect to the future water needs of their populations, *see Bijou*, 926 P.2d at 38–40, firm contractual commitments with municipalities or other agencies responsible for supplying water to individual users remain insufficient, in and of themselves, to support an application for a conditional water right. As we noted in *Bijou*, the "exception" for governmental planning does not completely immunize municipalities and similar governmental entities from speculation challenges. *Id.* at 38; *see also Pagosa I*, 170 P.3d at 315. Although a municipality may be decreed conditional water rights based solely on projected rather than existing needs, its entitlement to such a decree is nevertheless contingent upon a finding that the amount conditionally appropriated is consistent with its reasonably anticipated requirements, based on substantiated projections of future growth. *Bijou*,

926 P.2d at 39.[1] To defeat a speculation challenge, a contractual commitment for the sale or transfer of appropriative waters, even to a municipality, must therefore either be accompanied by a specific plan for application to a beneficial use or be necessary to satisfy reasonably anticipated requirements of the municipality, based on substantiated projections of its future growth.

■■■ Storage of diverted water is not itself a beneficial use. *People ex rel. Simpson v. Highland Irrigation Co.*, 917 P.2d 1242, 1251 (Colo.1996); cf. § 37–92–103(4), C.R.S. (2010) (including the impoundment of water for recreational purposes within the statutory definition of "beneficial use"); *Bd. of Cnty. Comm'rs v. Upper Gunnison River Water Conservancy Dist.*, 838 P.2d 840, 849 (Colo.1992) (application of refill water to beneficial use supported by contractual obligation to apply refill to further fishery, recreational and irrigational uses). Whether water is to be put to a beneficial use immediately or is to be stored for a reasonable time and then put to beneficial use, *see N. Sterling Irrigation Dist. v. Riverside Reservoir & Land Co.*, 119 Colo. 50, 55, 200 P.2d 933, 935 (1948) (storage decree may permit storage for reasonable time), a claim for a conditional water right cannot be based on a sale or transfer of the appropriative rights without firm contractual commitments for specific beneficial uses or, in the case of contracts with governmental entities with population needs, a demonstration of the reasonably anticipated requirements of those entities, based on substantiated projections of future growth, for which the claimed water is needed. And whether the claimed water is to be applied immediately or stored for a reasonable period first, it cannot be considered intended for a beneficial use if the applicant has already been decreed appropriative rights sufficient for the same use.

Although our emphasis in *Vidler* may have been on the firmness of contractual commitments, we have characterized our holding there as concluding that a claimant of a conditional water right must "substantiate a need for the claimed water" by showing a sufficient "relationship with *those who are to put the water to a beneficial use.*" *Rocky Mountain Power Co. v. Colorado River Water Conservation Dist.*, 646 P.2d 383, 388 (Colo.1982) (emphasis added). Whether "need" is more fittingly addressed in the broader terms of intent or commitment to appropriate for a beneficial use, *see Am. Water Dev., Inc. v. City of Alamosa*, 874 P.2d 352, 385 n. 44 (Colo.1994) ("Where the applicant is seeking to appropriate for the future needs and uses of others, it must present sufficient evidence to demonstrate their commitment to actual beneficial use of the water."), or subsumed within the concept of "beneficial use" itself through its definitional incorporation of "reasonably efficient practices" and the exclusion of waste, *see* § 37–92–103(4), C.R.S. (2010); *see also Ready Mixed Concrete Co. v. Farmers Reservoir & Irrigation Co.*, 115 P.3d 638, 645 n. 4 ("Wasting water by diverting it when not needed for beneficial use, or running more water than is reasonably needed for application to beneficial use, is 'waste'."), the concept of "need" has historically been integral, even if not always emphasized, to the limitation of an appropriation to uses, and amounts, for which the purported appropriator's existing water rights are insufficient. *See, e.g., Pagosa Area Water & Sanitation Dist. v. Trout Unlimited*, 219 P.3d 774, 787 (Colo.2009) (hereinafter "*Pagosa II*") (finding proof of need inadequate, in part, on grounds that "[a]t least 7,000 acre-feet of this demand can apparently be met by dry year yield from the District's existing water rights").

■■■ A purported appropriator's existing water rights clearly cannot be considered "insufficient" within the contemplation of the Act if they are unable to fulfill the purposes for which additional rights are sought only

---

1. In *Pagosa I*, 170 P.3d at 313, we made clear that a governmental water supply agency has the burden of demonstrating three elements in regard to its intent to make a non-speculative conditional appropriation of unappropriated water: (1) what is a reasonable water supply planning period; (2) what are the substantiated population projections based on a normal rate of growth for that period; and (3) what amount of available unappropriated water is reasonably necessary to serve the reasonably anticipated needs of the governmental agency for the planning period, above its current water supply.

because of waste, caused by inefficient practices. By the same token, a purported appropriator's existing water rights cannot be considered "insufficient" merely because they are inadequate to cover speculative sales or transfers entered into by the appropriator. Need can no more be based on the speculative sale or transfer of appropriative rights than could the intent to appropriate water for a beneficial use required for demonstration of a "first step."

An applicant for a conditional water right must, therefore, demonstrate that it needs the amount of water it claims; and where the applicant relies on contractual obligations to demonstrate that its existing water rights are inadequate to satisfy its needs, it must prove the existence of a specific plan and intent to put the contracted-for amount of water to a beneficial use or, in the case of contracts with governmental entities, that the contracted-for amount is necessary for the entity's reasonably anticipated needs, based on substantiated projections of population growth.

### III.

As the District makes clear on appeal, its assertion of need for the water rights it claims is based on its existing contractual obligations with municipal and commercial users rather than on the reasonably anticipated future population demands of the municipalities with which it contracts. Rather than disavow the testimony of its own witness to the effect that its contractual obligations involve a substantial amount of water for which delivery has never been sought and for which no plan for beneficial use has ever existed, the District asserts that these sales or transfers of appropriative rights are nonetheless *not* speculative because they involve firm contractual commitments, requiring yearly payments by the contractees and obligating the District to make delivery when needed. More specifically, the District argues that it has no responsibility to inquire of its contractees whether they need the water they pay for and are committed to its use, or whether they have merely contracted for these appropriative rights as an insurance policy in case they may need it. The Dis-

trict's need for additional sources of water is established, it contends, merely by demonstrating that it has existing contractual commitments for more than the firm yield of its Stagecoach Reservoir.

Apart from its contractual commitments, the District claims current demands on only 2,000 acre feet of its Stagecoach Reservoir supply, which is committed for its "umbrella augmentation plan." Even taking as established its assertion of a firm yield of no more than 8,825 acre feet, its assignment of error can therefore be rejected as a matter of law. Not only does the District fail to assert any over-commitment, independent of the 7,000 acre feet admittedly under contract for some future delivery without any plan for beneficial use; it also fails to substantiate that any of the 13,192 acre feet of water it has under contract is committed to a specific beneficial use or is necessary for the reasonably anticipated population growth of a contracting municipality. And in fact, it openly argues that its contractees' uses or planned uses of the water are irrelevant.

Necessary as contractual commitments may be, they are not sufficient in themselves to demonstrate that sales or transfers of appropriative rights are not speculative. The District's evidence was therefore, as a matter of law, insufficient to prove the extent of its legally cognizable demands on existing water rights or its need for additional rights. *See Pagosa II*, 219 P.3d at 788 ("[B]oth public and private appropriators must carry the burden of proving their claims for a conditional decree.").

In light of the District's erroneous legal theory concerning its "need" for additional supplies, it is unnecessary in this proceeding to resolve the technical question whether, and if so under what particular circumstances, a claim for direct flow and storage rights could be combined in a single application and decree for conditional water rights. Whether for storage or direct application, a conditional water right cannot be decreed in the absence of a specific plan and intent to put the appropriative waters to a beneficial use, including a demonstration of its need for the additional waters for that purpose. The record contains no suggestion that the Dis-

trict was deprived of an opportunity to prove any need it might have, separate and apart from its contractual obligations. Because its existing contractual obligations failed to demonstrate the insufficiency of its existing water supply, the evidence it presented was insufficient to support its application for conditional water rights, whether or not they were to be stored before being put to beneficial use.

## IV.

Because the applicant's evidence of existing demands included contracts for stored water that had admittedly not yet been put to beneficial use and for which no specific plan for beneficial use was offered, and because the applicant failed to adequately demonstrate a reasonably anticipated future need based on projected population growth, its evidence was insufficient to establish that it had made the required "first step" to obtain a conditional water right. The judgment of the water court is therefore affirmed.